**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **AFFINION BENEFITS GROUP, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:09-cv-0273** |
| | ) | |
| **ECON-O-CHECK CORP.,** | ) | **Senior Judge Thomas A. Wiseman, Jr.** |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Affinion Benefits Group, LLC ("Affinion") filed suit against Defendant Econ-O-Check Corp. ("EOC") alleging that EOC intentionally and wrongfully induced a large number of Affinion's clients to breach their contracts with Affinion, in violation of Tennessee common law and statute, Tenn. Code Ann. § 47-50-109, and engaged in unfair and deceptive conduct in violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-109.  Now before the Court is EOC's Motion for Summary Judgment (Doc. No. 98) seeking judgment in its favor and dismissal of all claims against it. Specifically, Econ-O-Check asserts that Affinion cannot establish, as a factual matter, the requisite elements of its claim for inducement of breach of contract and has not stated a valid claim for violation of the TCPA.  The major part of EOC's motion targets Affinion's contracts themselves:  EOC argues that those portions of Affinion's contracts that it is charged with inducing Affinion's clients to breach are unenforceable as a matter of law.  (Doc. No. 117, at 2.)  EOC argues that, because the existence of an underlying valid and enforceable contract is a required element of any claim for inducement to breach, the inducement claims necessarily fail.  It argues on essentially the same basis that it cannot be liable under the TCPA either.[1]

Also before the Court is Affinion's own motion for summary judgment as to EOC's counterclaims for Sherman Act violations and intentional interference with business relationships, and as to EOC's

---

[1] Presumably in an effort to reduce the page length of its "brief," EOC's argument as to Affinion's TCPA claim is contained entirely in a lengthy footnote.  Although it is clearly improper to include a substantive argument in a footnote, the Court will nonetheless consider it on the merits, in large part because the plaintiff did not object and has addressed the argument in the body of its response brief.

requests for a declaratory judgment that certain provisions in Affinion's contracts are unenforceable and a permanent injunction preventing Affinion from enforcing those provisions in its existing contracts and from using such provisions in future contracts  Affinion also seeks summary judgment as to EOC's affirmative defense that the contracts upon which Affinion's inducement claims are premised are illegal and therefore unenforceable.

After considering the parties' arguments and the entire record, and holding not one but two hearings on the motion, the Court finds that EOC is entitled to partial summary judgment in its favor. Specifically, the Court will grant summary judgment to EOC on Affinion's claims of inducement of breach of contract on the basis that the contract provisions at issue, the so-called "same or similar" and "continuation of benefits" clauses contained in Affinion's contracts with its bank customers, are unenforceable as a matter of law and public policy.  In all other respects, EOC's motion will be denied. Affinion's motion for summary judgment will be denied in its entirety.

I.      STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility

determinations or weighing evidence).  In responding to a motion for summary judgment, however, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Moreover, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party.  *Anderson*, 477 U.S. at 251.

Where, as here, the parties have filed cross-motions for summary judgment, each party as a movant for summary judgment bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law.  The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden on its own motion.  In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).  "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record."  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. Louisiana*, 757 F.2d 698, 705 (5th Cir. 1985)).  The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad. Co.*, 929 F.2d at 248.

## II.     ECON-O-CHECK'S MOTION FOR SUMMARY JUDGMENT

### A.     FACTUAL BACKGROUND

The facts set forth herein are undisputed or viewed in the light most favorable to Affinion for purposes of Econ-O-Check's motion.[2]

Affinion and Econ-O-Check are competitors in the business of providing "enhanced checking account services" to banks and other financial institutions ("FIs") such as credit unions.[3]  "Enhanced

---

[2] Affinion is a Delaware limited liability company with its principal place of business in Tennessee. Econ-O-Check is a Georgia corporation headquartered in Stockbridge, Georgia.  This Court  has diversity jurisdiction over this dispute.

[3] Affinion's contracts with credit unions are apparently not at issue in this case, however.

checking accounts" are accounts that bundle a variety of services and products into a single package, including such items as accidental death and dismemberment insurance, hotel and restaurant discounts, and identity theft protection, among others. The specific products and services that Affinion provides to the customers of a particular FI vary depending upon the desired program or programs agreed to by the FI. Affinion is the largest company in the enhanced checking account products industry, but, according to Affinion, FIs also have access to various other resources that they can combine to create "customer-targeted account products and programs," and to provide value, savings, and convenience for their account holders, including features like personalized checks, on-line banking services, and ATM cards. (D. Smith Dep. at 632:23–633:3.)

Affinion does not bring customers to the FIs with which it works. Rather, Affinion works directly with FIs to provide services to new or existing account holders at the bank. Typically, for bank customers opening new accounts that include bundled services as a result of a contract between the FI and Affinion, the customer is charged a single service fee by the FI for what the parties refer to as an "embedded account." That is, for an embedded account, there is a routine monthly service charge on the customer's account, debited directly by the bank, from the time the customer opens the account. (D. Smith Dep. 636:4–8.) The service fee includes both the FI's charge for banking services associated with the account, and Affinion's fee for non-banking services associated with the account. For these embedded accounts, Affinion does not receive the identity or account numbers of the individual account holders participating in the enhanced checking account. In addition, bank customers with embedded accounts are not necessarily aware that the enhanced services that are part of their account are offered by a third-party company separate and apart from the bank with which they are entering into a relationship. It is clear that a substantial majority of the customer accounts at issue here are "embedded" accounts, for which the partner financial institution debits the customer's account directly on a regular basis and remits to Affinion its portion of the fees collected.

In situations where a customer already has an account but chooses to enroll in a suite or package of services offered by Affinion through the bank, the customer may pay a separate fee, in addition to whatever service charge he is already paying in association with the particular account. (D. Smith Dep. 635:16–24.) This type of arrangement is referred to in the industry as an "overlay" account. Affinion's

30(b)(6) witness, Douglas Smith, testified that he was not sure whether any of the banks at issue in this lawsuit had "overlay" accounts or whether they only had "embedded" accounts. (D. Smith Dep. 635:25–636:3.) In any event, "overlay" accounts comprise a very small minority of the total accounts Affinion services. For these accounts, Affinion typically has been provided with the customers' unencrypted account numbers, and debits each customer's account directly and remits to the partner FI its portion of the fees collected. It is unclear to the Court whether these "overlay" accounts are implicated in the present suit.

Affinion's relationship with its FI customers is governed by contract. Typically, Affinion or one of its affiliates enters into exclusive-dealing contract with the particular FI with a minimum term of three to five years, an auto-renewing provision of one year or longer, and the option to terminate by giving notice of intent to terminate at least 120 days prior to the end of the initial term or a renewal term. (*See* Complaint, Ex. E, Doc. No. 1-1, at 21–25 (March 2006 Fee Income Program Schedule and Joint Marketing Agreement ("JMA") between The Farmers Bank and Progeny Marketing Innovations, Inc. ("PMI," Affinion's predecessor-in-interest)); Complaint, Ex. G, Doc. No. 1-1, at 27–32 (April 2004 Fee Income Program Schedule and JMA between Pioneer Community Bank, Inc. and PMI)).)[4]

Contained in the sample agreements submitted with the Complaint are two "post-termination" provisions that do not go into effect until after the contract term between Affinion and the bank ends.[5] The first provision is a type of "non-compete" clause to which the parties refer as the "same or similar" clause, which generally prohibits the FI from offering the same or similar "enhanced" checking programs to its

---

[4] Affinion has now introduced into evidence a computer file with a chart referencing each of the contracts it believes have been breached, and hyperlinks to those contracts. The language and covenants employed in Affinion's (and its predecessors') contracts vary from one contract to the next, and have clearly evolved over time. It appears that the two contracts cited herein and filed with the Complaint are fairly typical for contracts executed after about 2003.

[5] In addition, many of Affinion's contracts include a second "non-compete" clause that is unlimited in duration. This clause provides that "following termination, [the bank] shall not . . . solicit, permit the solicitation of, or convert any Member into any other program that is the same or substantially similar to the program in which such Members are or were enrolled." (March 2006 JMA § 5.5.) EOC argues strenuously in its motion that the "perpetual" non-compete is unenforceable. In its response, Affinion points out that its Complaint does not assert any claims based upon that provision and apparently concedes that it is unenforceable. The Court therefore will not address the perpetual non-compete, which it likewise presumes to be unenforceable.

customers for one year after termination of the Affinion program. In the 2006 sample contract, this clause reads as follows:

> FI acknowledges that CFMG [an Affinion affiliate or predecessor] has expended substantial time and expense in the development and implementation of the Programs, that the Programs incorporate the intellectual property, proprietary knowledge and know-how of CFMG, and that the Programs offer valuable benefits and services to Members. Accordingly, FI will not . . . for a one (1) year term after expiration or termination of each Program Schedule, market or make available to any of its Customers any program that is similar to, in whole or in part, the Program offered thereby.

(Complaint, Ex. E, JMA ¶ 6, Doc. No. 1-1, at 24.) The 2004 sample JMA provides an identical recitation of the bank's recognition of the Affinion affiliate's investment in the "Programs" pursuant to which the bank agrees "to not offer, directly or indirectly, . . . a program the same as, or substantially similar to any Program to its Customers . . . for one year following termination for any reason." (Complaint, Ex. G, JMA ¶ 6, Doc. No. 1-1, at 28.)[6] Affinion acknowledges that, pursuant to that provision, the financial institution "would not be able to offer enhanced-checking services to new or existing customers for a full year after termination." (Smith Dep. 792:16–19.)[7]

The second type of provision to which EOC objects is a "continuation of benefits" ("COB") clause which requires that if a bank ever terminates its contract with Affinion, and the bank's program is an "embedded" program, then the bank must give Affinion all the enrolled account holders' names, addresses and account information so that Affinion can bill the client directly for the non-banking services that Affinion was already providing in conjunction with the banking services. The COB clauses typically state that the FI's customers who had been receiving services indirectly supplied by Affinion as part of their enhanced checking accounts "shall automatically continue" to receive those services as a separate bundle directly from Affinion:

> The parties acknowledge and agree that . . . in the event of termination of any individual Program or alternatively the entire Agreement, Members of the affected Program shall automatically continue to receive their Benefits, Program Fees shall continue to be collected in accordance with the Program Schedule. . . .

---

[6] These same clauses prohibit the FI from offering the "same or similar" programs to its customers during the term of the FI's contract with Affinion. To the Court's understanding, Affinion does not allege that its FI customers have breached those provisions, nor does EOC challenge their enforceability.

[7] At least some of Affinion's clients have negotiated contracts that do not contain post-termination non-compete clauses. (D. Smith Dep. 724:5–727:10 and Ex. 188; D. Smith Dep. 731:14–733:3 and Ex. 191.)

(2004 JMA ¶ 5.3; *cf.* 2006 JMA ¶ 5.5.)   The same language is echoed with greater detail in the Fee Income Program Schedules that accompany the JMAs:

> In the event of termination of this Fee Income Program Schedule for any reason, Fee Income Members shall automatically continue to receive their Fee Income Benefits through FSA,[8] which is entitled to collect its fees through the Automated Clearing House ("ACH") in accordance with the Membership Agreement made between FSA and each Fee Income Member at the time of enrollment in the Fee Income Program; provided however, that if for any reason FSA is prohibited from collecting such fees through the ACH, then FI shall, directly or through designated service providers . . . bill and collect such fees from the Fee Income Members on behalf of FSA and forward such fees to FSA.  In such event, FI shall provide [Affinion] with the Fee Income Member information necessary to facilitate a notification mailing at least 60 days prior to the effective date of the Fee Income Program termination and shall authorize  [Affinion] to prepare and send such notification to Fee Income Members on behalf of FI.  Such notification shall inform Fee Income Members (i) that FI no longer desires to provide the Fee Income Program as part of its checking account portfolio, (ii) that their Fee Income Benefits shall automatically continue to be provided by FSA, (iii) the amount of the monthly fee that will be automatically charged to their accounts for the provision of the Fee Income Benefits and (iv) that they may discontinue their receipt of the Fee Income Benefits at any time by sending  [Affinion] a completed waiver of Benefits form (sent to Fee Income Members in such notification) or by calling  [Affinion]'s call center.

(2006 Fee Income Program Schedule ¶ 6, Compl. Ex. E, Doc. No. 1-1, at 22; D. Smith Dep. 788:25– 789:7.)[9]  If, however, the program is already based on direct ACH billing by Affinion, then Affinion already has possession of the enrolled account holders' contact and account information and has no need to obtain the information from the bank in order to continue billing account holders for services.

In either event, prior to or concurrently with a FI's termination of its contract with Affinion, Affinion sends a letter to bank customers enrolled in the program, informing them of the FI's termination and the account holder's right to continue receiving benefits from Affinion.  Most, though not all, of the notice letters do not give the consumer the opportunity to "opt in" to continue receiving benefits from Affinion; rather, they typically require the consumer to "opt out" if she does not want to continue receiving benefits. (Smith Dep. 512:4–513:21 & Ex. 131; March 2006 Fee Income Program Schedule ¶ 6.)

---

[8] "FSA" is not defined in the Schedule, but it is defined in the accompanying JMA, obliquely, by indicating that the FI entering the JMA "shall be a sponsor member for its local chapter of the Financial Services Association ("FSA") . . . .  Customers purchasing  . . . a membership in certain applicable Programs shall be individual members of the [FSA]."  (2006 JMA, Preface, Doc. No. 1-1, at 23.)

[9] Affinion quibbles with EOC's assertion that the terms of this COB provision are "typical."  (*See* Affinion's Resp. to EOC's Statement of Undisputed Fact. No. 18.)  However, Affinion has not pointed to language in any other contracts containing a COB that does not contain the quoted language, and in fact Doug Smith agreed to EOC's characterization of the language as typical in his deposition.

Affinion asserts that the bank customers all sign an enrollment form at the time they open their account at the bank, they authorize Affinion to access that account information for billing purposes, and therefore have authorized the bank to provide Affinion with the necessary information for it to bill the customers directly (*i.e.*, names, addresses, and account numbers).  In that regard, the enrollment forms used by Affinion and the banks with which it contracts vary slightly in content.  What follows is a sampling of the relevant content of the forms that are in the Court's record, all of which are titled "Membership Agreement,"  "Membership Enrollment," or "Membership Enrollment Agreement":

> As the signer of this Membership Enrollment, you . . . are enrolled as members of Financial Services Association (FSA). . . .  *By signing, you authorize your FI or its service provider to debit your checking account for your monthly membership dues, if applicable, and to remit the portion of any applicable fee used to pay your insurance premium to the Plan Administrator.*

(Doc. No. 53-1, at 8; Doc. No. 124-12 (emphasis added).)

> Member acknowledges receipt of program membership materials and insurance disclosures.  *Member agrees to the terms of the insurance coverage, other services, any applicable monthly membership dues*, and any announced changes in fees or services. . . .

(Doc. No. 53-1, at 8 (emphasis added.)

> As the signer of this Membership Enrollment you . . . are enrolled as members of Financial Services Association (FSA). . . .  *Your monthly membership dues, if applicable, will be conveniently deducted from your checking account by either your FI or FSA, and part of it will be used to pay your insurance premium.*

(Doc. No. 53-1, at 9 (emphasis added).)

> As the signer of this Membership Enrollment, you . . . are enrolled as members of Financial Services Association (FSA). . . .
>
> *By signing, you authorize your FI and/or the Plan Administrator to debit your checking account at your FI directly or by electronic debit for your monthly membership dues, if applicable.*  A portion of the monthly membership dues will be used to pay your insurance premium.

(Doc. No. 53-1, at 11 (emphasis added).)

> As the signer of this Membership Enrollment, you . . . are enrolled as members of Financial Services Association (FSA). . . .  *You may cancel your membership at any time by completing a Waiver of Benefits form, which may be obtained from your FI or FSA. . . . Your monthly membership dues, if applicable, will be conveniently deducted from your checking account by either your FI or FSA*, and part of it will be used to pay your insurance premium.

(Doc. No. 53-1, at 12 (emphasis added).)

Member acknowledges receipt of program membership materials and agrees to the terms of the insurance coverage, other services, *any applicable monthly membership dues*, and any announced changes in fees or services.

(Doc. No. 53-1, at 12 (emphasis added).)

As the signer of this Membership Enrollment, you . . . are enrolled as members of Financial Services Association (FSA). . . . *By signing, you authorize your FI or its service provider to debit your checking account for your monthly membership dues, if applicable*, and to remit the portion of any applicable fee used to pay your insurance premium to the Plan Administrator.

(Doc. No. 53-1, at 13 (emphasis added).)

Several of the quoted membership enrollment forms reference Financial Services Association ("FSA"), which is apparently associated with Affinion, though the relationship has never been adequately explained to the Court. Operationally, Affinion treats FSA as Affinion and vice-versa (D. Smith Dep. 180:2–7), although the relationship between Affinion and FSA is never disclosed to the bank's customer either. (D. Smith Dep. 190:10–13.) In any event, according to Affinion, when a customer signs an enrollment card referencing FSA, the customer then has a relationship with Affinion as well.

In the "manual situation," that is, in the case of embedded programs which make up the majority of the programs at issue here, Affinion does not receive copies of the enrollment cards; the financial institutions retain possession of them. (Nelms Dep. 45:14–23.) In situations where the customer elects to participate in an Affinion program after having already opened an account, he authorizes Affinion to debit his account directly through ACH at the time of his enrollment in the program, in which case Affinion obtains a copy of the enrollment card. (Nelms Dep. 45:25–46:1.)

As indicated above, while the FI and Affinion continue to operate under their Joint Marketing Agreement, the FI's customers typically continue to receive a package of certain benefits in conjunction with their checking accounts that are paid for through their monthly service charge that is debited by the FI; some but not all the benefits associated with that fee are provided by Affinion. When a bank whose customers are enrolled in an "embedded" program terminates a contract with a COB provision, and the customers do not "opt out" from continuing to participate in the program upon receiving notice of their ability to do so, the customers will not necessarily continue receiving from Affinion the same package of services they had been receiving from the bank; rather, Affinion continues to provide the same benefits it was providing before and begins charging a separate fee specifically for those services, irrespective of

what services the bank continues to offer (and charge the client for).  (Smith Dep. 411:15–413:20.)

According to Doug Smith, Affinion's two primary interests in the COB provisions are (1) Affinion's "concern[] about the end member's experience," and (2) to ensure that Affinion "recoup[s] the upfront costs" of implementing its relationship with the bank.  (Smith Dep. 247:4–8.)  Smith also agreed that the COB provision operates to "prevent[] competitors from converting existing accounts."  (D. Smith Dep. 248:4–9.)  Likewise, one effect of the "same or similar" provision is to "prevent . . . a bank from switching its provider from Affinion to Econ-O-Check, or some other competitor in the marketplace."  (D. Smith Dep. 336:6–11.)  Affinion asserts that the purpose of this non-compete is "to protect account holders from opportunistic poaching" (Doc. No. 140, Pl.'s Add'l Statement of Material Facts ¶ 47.)  EOC insists that Affinion includes the one-year non-compete provision as an unreasonable restraint of trade in order to protect its revenue and monopoly power.

Affinion spends a great deal of time, money and expertise to implement new programs at financial institutions.  (*See* Verified Complaint, ¶¶ 8-9; A. Dick Expert Report ¶¶ 92-97.)  For financial institutions that implemented new programs with Affinion from 2005 through 2007, the average time it took to recover upfront costs was approximately nineteen months (Greenberg Dep. 111:9–11), and the minimum time was ten months (4/22/2009 Decl. of D. Smith, Doc. No. 55, at ¶ 3).  The typical length of Affinion's contract term is three to five years, well in excess of the nineteen-month average length of time for recouping its costs.  According to Affinion, however, it continues to incur additional ongoing marketing expenses and non-financial investments in its partner programs, and continues to build the financial institutions' account-holder base participating in the enhanced-checking program through the term of the contract.  (Alexander Dep. 41:18-42:8.)

Affinion does not always implement COB after a financial institution terminates.  According to Doug Smith, "COBs are expensive and they don't necessarily always end up being profitable." (Smith Dep. 513:6–7.)  Smith also testified that, as a practical matter, it was not always possible to enforce the COB.  (Smith Dep. 441:23–25.)  Affinion's "termination reports" from 2007 through 2009, which list pending terminations (Smith Dep. 500:12–14), identify fewer than ten percent of the terminations listed as

"COB." (Smith Dep. 502:25–505:7 & Ex. 129.)[10]  Smith testified in his deposition that he could not "say definitely one way or the other whether Affinion would have pursued COB with respect to all of the banks it has identified in this litigation that it contends were tort[i]ously interfered with." (Smith Dep. 156:3–8.)

**B.    ANALYSIS AND DISCUSSION**

**1.    Affinion's Claims of Inducement of Breach of Contract**

EOC argues that Affinion cannot present evidence sufficient to create a jury question as to each of the elements of its claims for inducement of breach of contract or for violation of the Tennessee Consumer Protection Act.  EOC focuses its arguments, however, on the question of the legality and enforceability of Affinion's COB and the "same or similar" non-compete provisions.  Specifically, EOC argues that the "same or similar" provisions are unenforceable because they violate state law, as a result of which no claim for inducement to breach those provisions will lie.  EOC similarly argues that the COB clauses in Affinion's contracts violate federal banking statutes and regulations as well as the NACHA Operating Rules and "Regulation E," which govern banks, and for that reason are likewise unenforceable under state law.  In addition, EOC argues that the same provisions are unenforceable under federal antitrust law.

To prevail on a claim for inducement of breach of contract under both the Tennessee common law and statute, Tenn. Code Ann. § 47-50-109, a plaintiff must first prove, as a threshold matter, the existence of a legal and enforceable contract.  *Hanger Prosthetics & Orthotics E., Inc. v. Kitchens*, 280 S.W.3d 192, 205 (Tenn. Ct. App. 2009); *New Life Corp. v. Thomas Nelson, Inc.*, 932 S.W.2d 921, 926 (Tenn. Ct. App. 1996); *Emmco Ins. Co. v. Beacon Mut. Indem. Co.*, 322 S.W.2d 226, 231 (Tenn. 1959).  If the contract provisions upon which Affinion's claims are based are unenforceable as a matter of law and/or public policy, then Affinion's claims based upon EOC's inducement of the breach of those particular provisions will necessarily fail.  *See Givens v. Mullikin*, 75 S.W.3d 383 (Tenn. 2002) (holding that the plaintiff had not stated a claim for inducement to breach a contract where she had not alleged facts sufficient to show the existence of an enforceable underlying contract); *TCF Indus., Inc. v. Tomlin*,

_____

[10] Deposition Exhibit 129, which is the exhibit referenced in this portion of Smith's deposition and purportedly includes "termination reports by month, some from 2007, some from 2008, and some from 2009" (Smith Dep. 500:8–24), appears not to be in the Court's record.

743 S.W.2d 169, 172 (Tenn. Ct. App. 1987) (noting that where a plaintiff has no legal right to enforce a contract, he cannot maintain an action against a third party for inducing its breach).

EOC maintains that the contracts that are the subject of Affinion's inducement claims are unenforceable because the provisions Affinion alleges were breached—the "same or similar" and COB clauses—are unenforceable as a matter of Tennessee and Federal law. We turn to that issue now.

### (a)    Enforceability of "Same-or-Similar" Clauses under Tennessee Law

As set forth above, the "same-or-similar" provision as it typically appears in Affinion's contracts states that the signatory bank "will not . . . for a one (1) year term after expiration or termination of each Program Schedule, market or make available to any of its Customers any program that is similar to, in whole or in part, the Program offered thereby." (Complaint Ex. E, March 2006 JMA ¶ 6, Doc. No. 1-1, at 24; *see id.* Ex. G, April 2004 JMA ¶ 6, Doc. No. 1-1, at 28 (in which bank agrees "to not offer, directly or indirectly, . . . a program the same as, or substantially similar to any Program to its Customers . . . for one year following termination for any reason").)

EOC analogizes these clauses to covenants not to compete that more typically appear in the context of employment contracts. EOC contends that Affinion's non-compete clauses constitute agreements in restraint of trade that serve no legitimate business purpose and, instead, exist only to discourage or prohibit legitimate competition. EOC argues that, as such, the clauses are unenforceable. Affinion does not dispute that the clauses in question are covenants not to compete, but argues that they are reasonable in scope and duration and necessary to protect Affinion's legitimate business interests.

A typical covenant not to compete in the employment context prevents the employee from practicing her trade within a certain area for a specific period of time after termination of the employment agreement. *See, e.g.*, *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 676 (Tenn. 2005) (a medical doctor employed by a hospital agreed that, upon the termination of his employment contract, for any reason, he would not engage in the practice of medicine within a twenty-five mile radius of Murfreesboro, Tennessee for a period of eighteen months). Most of the case law in Tennessee concerns non-competes in the employment context. Generally, such covenants are disfavored as restraints of trade and are construed strictly in favor of the employee. *Id.* at 678; *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472–73 (Tenn. 1984). Covenants not to compete are not *per se* invalid; rather, they may be

enforced if they are reasonable under the particular circumstances. *Hasty*, 671 S.W.2d at 472 (citing *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966)). Determining whether an agreement in restraint of trade is reasonable, and therefore enforceable, is a question of law for the Court where the material facts are undisputed. *Baker v. Hooper*, No. 03A01-9707-CV-00280, 1998 WL 608285, at *6 (Tenn. Ct. App. Aug. 6, 1998); *See Murfreesboro Med. Clinic*, 166 S.W.3d at 683 (holding physicians' covenants not to compete are unenforceable and void as a matter of public policy).

The contract clauses at issue here do not arise in the employment context; rather, they are ancillary to joint marketing agreements between a supplier of insurance and other products (Affinion) and financial institutions (banks and credit unions). The "same or similar" clauses, however, are clearly "restraints on trade" and have the effect if not the form of a covenant not to compete: They prevent banks from engaging with third-party competitors who would provide the same type of services to the bank's customers that Affinion has already been providing. In other words, the primary effect of the same-or-similar clause is to prevent non-parties to the agreement (*e.g.*, EOC) from competing directly with Affinion. The bank that is actually a party to the covenant is restricted *vis-à-vis* other banks, with which Affinion does not directly compete. That is, the particular FI to which the covenant applies is prevented, for a year, from offering enhanced checking services that are the same as or similar to those it previously offered through Affinion and, in that manner, is unable to compete with competitor banks in the community that are still offering such services and products. In other words, the non-compete clause directly restricts the bank in its competition with other banks, and indirectly hinders Affinion's would-be competitors from offering their products to that bank.

Although these provisions arise outside the employment context, and are entered into between companies with relatively more bargaining power than the average employee, they are still restraints on trade, and the Court concludes that Tennessee courts, if called upon to consider these provisions, would view them in essentially the same light it views non-competes in the employment context. As such, the provisions are enforceable under Tennessee law only if they are reasonable under the circumstances. Tennessee courts have instructed that the factors to be considered in assessing reasonableness include whether the covenant not to compete seeks to protect a legitimate business interest, the economic hardship imposed on the restricted party, and whether such a covenant would "be inimical to the public

interest." *Allright Auto Parks*, 409 S.W.2d at 363. To serve a "legitimate business interest," a non-compete clause must protect some interest "over and above ordinary competition" such that, without the non-compete, "an unfair advantage in future competition" would arise. *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999).

With regard to these considerations, Affinion argues that the clause is intended to protect legitimate business interests, as explained in the JMA itself:

> [FI] acknowledges that [Affinion] has expended substantial time and expense in the development and implementation of the Programs, that the Programs incorporate the intellectual property, proprietary knowledge and know-how of [Affinion], and that the Programs offer valuable benefits and services to the Members.

(Compl. Ex. E ¶ 6, at 24, Ex. G at 28.) Affinion asserts that because it spends such a great deal of time, money, and expertise in implementing programs at the financial institutions, the established programs are

> desirable to Affinion's competitors because there is no need for initial marketing or training or enrolling account holders because Affinion has already done all of that work. The competitor is able to swoop in and have an automatic membership base with immediate revenue. The competitor is then able to avoid start-up costs associated with implementing a new program and avoid the lag time between initiation of service and collection of premiums. Competitors are able to lure financial institutions away because this "conversion" model has little to no costs, allowing the competitor to offer the same services and benefits to the account holders at the same price, while at the same time promising the financial institutional a greater portion of the fees collected from account holders.

(Affinion's Mem. Opp. Summ. J. at 17–18, Doc. No. 139, at 22-23 (internal citations to the record omitted).) Affinion further argues that the one-year limited term of the same-or-similar clause is reasonable in duration because the "average" time frame within which Affinion recoups its upfront costs in implementing a program is nineteen months, and, further, that there are some institutions from which Affinion "never" recouped its set-up costs. (*Id.* at 18 (citing Greenberg Dep. 108:7–17).) In addition, Affinion contends that even if it is able to recoup its costs during the contract term, it "continues to incur additional ongoing marketing expenses and non-financial investments in its partner programs, and continues to build the financial institutions' account-holder base participating in the enhanced-checking program. (*Id.*)

As EOC points out, however, the duration of Affinion's contracts is typically five years and at least three years in length; Affinion has actually been in business relationships with many of its FI partners for decades; and Affinion's claim that there are banks from which it never recoups its upfront costs is not

actually supported by the citation to the record.[11]  Further, to be clear, Affinion does not allege here that EOC has induced FIs to breach their Joint Marketing Agreements with Affinion; rather, the institutions are terminating the relationships at the expiration of the initial term or a renewal term of the JMA in accordance with its provisions.  Affinion alleges only that EOC is encouraging the banks to disregard the one-year covenants not to compete that go into effect after Affinion's relationship with the bank has otherwise ended.  It is undisputed, however, that by that time, Affinion has generally recouped its upfront costs; Affinion has not produced a single example of a situation in which it had not done so.  More to the point, once a JMA has terminated in accordance with its own terms, Affinion has either recouped its costs or it has not; that fact will not change as a result of enforcement of the non-compete.  In short, the one-year covenant not to compete has no direct bearing on Affinion's ability to recoup its upfront costs.  Instead, the point of the covenant can only be to prevent the financial institution from entering into a relationship with Affinion's competitors for an entire year, and thereby to discourage the bank from *ever* terminating its relationship with Affinion in the first place, even if the termination is in accordance with the contract itself, and even if Affinion's competitors are offering lower prices or more desirable services and products.

Affinion's other proffered legitimate business interests are similarly flimsy.  To the extent Affinion provided the banks with specialized training, EOC has shown that it retrains bank employees to use its own systems and products.  Affinion does not provide banks with valuable customer relationships and, in fact, the bank customers are generally unaware of Affinion's existence as an independent entity.  With respect to Affinion's argument that it incurs ongoing costs during the course of its relationship with the bank, the fact is that any company in business incurs similar expenses.  Moreover, those costs certainly are not going to be recovered through the enforcement of the non-compete.  Again, either Affinion is making a solid return on sales of products and services to the financial institutions during the duration of the Joint Marketing Agreements or it is not.  Finally, although Affinion clearly has an interest in protecting its trade secrets and confidential information, the non-compete has no apparent effect on the protection of those interests.

---

[11] Mr. Greenberg testified that Affinion "certainly" had clients on the books from which it had "not yet" recouped all its costs, but he could not say whether any of those clients were among those with whose contracts Affinion alleged EOC had interfered.  (Greenberg Dep. 108:12–22.)

Affinion points to the case of *Statco Wireless, LLC v. Southwestern Bell Wireless, LLC*, 95 S.W.3d 13 (Ark. Ct. App. 2003), as a case that has found a non-compete similar to those used by Affinion to be enforceable.  In that case, the appellee, Southwestern Bell Wireless ("Bell") was in the business of selling cellular phone service, and the appellant, Statco Wireless ("Statco") became an authorized agent for Bell in a large metropolitan area, selling Bell's services exclusively in return for commissions paid by Bell.  The agency agreements incorporated a covenant not to compete in which Statco agreed that, for a year following termination of the agency agreements, it would not induce customers to choose the services of any Bell competitor, nor otherwise sell or promote cellular services offered by any competitor.  For three years, the parties enjoyed a profitable relationship, and Statco became one of Bell's most successful agents.  During the fourth year, a dispute arose over compensation, and Statco notified Bell that it was terminating the relationship and that it would begin selling competitors' services.  Bell immediately sought an injunction prohibiting Statco from violating the covenant not to compete.  A trial was held and the trial court upheld the covenant and enjoined Statco from violating it.  On appeal, the Arkansas Court of Appeals upheld the trial court's decision on the basis that the covenant protected a valid business interest, and that it was not overly broad either geographically or temporally.

Specifically, the court found that Bell had a valid interest in protecting its customer lists, noting that customer lists "have been looked upon . . . as a most valuable asset that is especially worthy of protection, particularly in a situation, such as the one here, where an agent is servicing customers away from the principal's place of business and builds up personal relationships that bind the customer to him instead of the principal."  *Id.* at 17.  In response to Statco's argument that it, not Bell, had actually developed the customer list and customer relationships through its own effort, the court found that this argument actually reinforced Bell's position, because Statco had acted as Bell's agent, not on its own behalf, and had worked to enroll subscribers to become Bell customers.  The court also recognized a protectable interest in Bell's agent-compensation plans and bid proposals.

There, as here, the covenant at issue was part of an arms-length contract entered into between business entities, was a "conspicuous part of the contract," and the parties agreed in the contract that the covenant was necessary to protect the interests of the party in whose favor it was given.  In the case at bar, however, the banks do not function solely as agents for Affinion in enrolling banking customers—the

customers are legitimately the bank's customers and only tangentially or indirectly customers of Affinion, of whose existence the customers are generally unaware. Moreover, Affinion has not actually argued that the purpose of the non-compete is to protect valuable customer lists—it contends the non-compete is to prevent "opportunistic poaching" by its competitors and to prevent "potential confusion" on the part of account holders. And perhaps most importantly, the court's discussion of the factual background in *Statco* does not reveal whether Statco breached the parties' agency agreement when it terminated the contract, or whether it terminated the parties' relationship in accordance with the contract's provisions for termination. The discussion also does not indicate whether the covenant not to compete took effect at all in the latter situation, that is, at the natural expiration of the parties' agency agreement. In the present case, the non-compete only goes into effect after the expiration of a contract term,[12] regardless of whether Affinion and the particular bank have been in business for five years or twenty years.

Largely on the basis of that fact, the Court finds, under the particular circumstances of this case, that Affinion has not shown that it seeks to protect a legitimate business interest. Even if it did, it has not shown that the one-year non-compete is reasonably designed with a view toward protecting that interest. In other words, although Affinion obviously would like to prevent EOC and other competitors from "poaching" on systems and programs Affinion has invested time and money in implementing, its method of doing so appears to unduly hamper the individual banks' ability to terminate their relationship with Affinion, and is also inimical to individual consumers' interest in obtaining competitive pricing for the same bundled services and products. Because the one-year covenant continues in effect even after the expiration of a JMA contract by its own terms, and thereby effectively hamstrings banks' ability *ever* to change providers should they wish to do so, it stifles ordinary competition.

For all these reasons, the Court finds that the one-year non-compete is not valid and enforceable. Making the covenant of shorter duration would not render it more reasonable, because it does not protect a valid business interest in the first place. The Court agrees with Affinion that excision of these clauses is possible; the finding that the clauses are not enforceable does not affect the validity of the Joint Marketing Agreements as a whole. However, to the extent Affinion's inducement claims are premised upon breach of these provisions, they must fail on the basis that the provisions themselves are unenforceable.

---

[12] To be sure, the contracts prevent banks from offering competitor products for the duration of the JMAs, but those provisions are not at issue here.

### (b)  Enforceability of the COB Clauses

Next, EOC argues that the continuation-of-business ("COB") clauses in Affinion's JMAs are unenforceable and void as against public policy because they require banks to violate federal law as well as binding rules pertaining to electronic funds transfers in several separate ways:  (1) by requiring banks to disclose their customers' nonpublic personal information to Affinion in violation of the Gramm-Leach-Bliley Act ("GLBA"); (2) by requiring banks to disclose their customers' unencrypted account numbers to Affinion in violation of the GLBA; and (3) by enabling Affinion to debit directly bank-customer accounts without valid authorization, in violation of 12 C.F.R. § 205.10, or "Regulation E," and also in violation of and the Operating Rules and Guidelines of the National Automated Clearing House Association ("NACHA").

Affinion describes the effect of the COB provision as follows:

> During a contract term, Affinion either i) debits the account holder's account through what is known as ACH (automatic recurring electronic funds transfer) and remits a portion of the monthly payment to its financial institution customer, or ii) the financial institution charges the account holder a banking fee and then remits a portion of the monthly payment to Affinion. . . .  When a financial institution terminates a contract with Affinion, the COB provision provides that the financial institution will work with Affinion to effectuate the continuation and billing of the program users.

> In instances where Affinion was already billing by ACH, Affinion has possession of the customer contact and account information and simply sends a letter to the account holder explaining the existing COB procedures, including the account holder's option to cancel the benefits at any time.  In the case of a manual billing to an account holder, the account holder has signed an enrollment form at the very beginning of the relationship authorizing the financial institution and/or the program administrator (Affinion) to debit his or her account.  Relying upon these original forms, together with the opt-out letter and packet sent to the account holder upon the financial institution's termination of the relationship with Affinion, Affinion continues to provide the benefits the consumer has selected and is receiving by his or her choice, but starts to directly bill the account holder through ACH.

(Doc. No. 110, at 27–28.)  Affinion points out that EOC's motion does not address the situations in which Affinion has already been directly debiting an account-holder's account through ACH; it only addresses the way Affinion deals with the "embedded" or "manual-billing" situation, where the bank has been debiting the customer account and remitting a portion of the fee to Affinion.

### (i)  The Gramm-Leach-Bliley Act

Congress enacted the Financial Modernization Act, also known as the Gramm-Leach-Bliley Act (the "GLBA" or the "Act"), Pub. Law 106-102, §§ 501–27 (1999), codified at 15 U.S.C. §§ 6801–6809, in

1999.   The stated purpose underlying the GLBA is "to enhance competition in the financial services industry by providing a prudential framework for the affiliation of banks, securities firms, insurance companies, and other financial service providers."  H.R. Conf. Rep. No. 106-434, at 245 (1999), *reprinted in* 1999 U.S.C.C.A.N. 245, 245.   Realizing that the adoption of the Act would afford such financial institutions even greater access to consumers' personal financial information, H.R. Rep. 106-74, pt. 3, at 106–07 (June 15, 1999), Congress granted broad privacy protections to consumers, giving them the power to choose whether their personal information would be shared by financial institutions.  Regulations implementing the GLBA were issued jointly by the by the Federal banking agencies (the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision) for banks and savings associations, on June 1, 2000.  *See* 15 U.S.C. § 6804 (authorizing rulemaking); 65 Fed. Reg. 35162 (June 1, 2000).[13]

*(A)        Disclosure of Unencrypted Account Numbers*

Under the GLBA and its implementing regulations, a financial institution may not disclose an unencrypted account number to any nonaffiliated third party[14] "for use in telemarketing, direct-mail marketing, or other marketing through electronic mail to the consumer."   15 U.S.C. § 6802(d); *cf.* 12 C.F.R. § 40.12(a).[15]

There are two exceptions to this prohibition.  First, account numbers may be shared by a financial institution with a third-party agent or service provider to perform marketing of the financial institution's *own* products and services, as long as the agent or service provider does not have the means to directly initiate a charge.  Second, the account number may be provided to a partner company in a private label or affinity credit card program.  12 C.F.R. § 40.12(b)(1) & (2).  Clearly, neither of those exceptions applies in this case.

---

[13] Each of the different agencies issued its own set of conforming regulations.  *See* 12 C.F.R. Pts. 40, 216, 332, 573, & 716.  Because the regulations are uniform, the Court cites only to those issued by the Office of the Comptroller of the Currency, 12 C.F.R. Pt. 40, in order to eliminate redundancy.

[14] The term "nonaffiliated third party" is defined as a company that is not "related by common ownership or affiliated by corporate control."  15 U.S.C. § 6809(5).  Affinion is not alleged to be affiliated with any of the FIs with which it does business.

[15] The regulation adds that this restriction does not apply to the provision of encrypted numbers, provided that the financial institution does not give the third party the means to decode the number.  12 C.F.R. § 40.12(c).

Affinion's position, however, is that § 6802(d) does not apply at all because, at the time it is obtaining customer account numbers from the FI, it is not doing so for the purpose of *marketing*. Affinion contends instead that, after the FI has given notice that it will not renew the JMA, Affinion seeks to contact the parties' joint customers for the purpose of enabling it to continue providing the same products and services it has already been providing to those customers, at the customers' request.

To the contrary, the Court finds that Affinion seeks the account information specifically for the purpose of conducting a marketing campaign to retain customers of the FI that it might otherwise lose after the termination of the FI's relationship with Affinion and the concurrent termination of the bank's responsibility under the JMA to market Affinion's products. This is true whether Affinion is obtaining the account numbers before or after expiration of the JMA. Marketing does not end simply because the customer is already using a product, particularly given that the customer is concurrently being given notice of its right to "opt-out" of continuing to receive services and products from Affinion. The Court therefore finds that § 6802(d) applies, that neither exception to that provision applies, and that the banks are not permitted to give unencrypted account numbers to Affinion for the purpose of enabling it to market its products to the bank's customers.

*(B)     Disclosure of Nonpublic Personal Information*

Moreover, under the GLBA, a financial institution may not share "nonpublic personal information" with a non-affiliated third party unless the institution provides the customers with a notice of its privacy policies both at the time the customer relationship is established and annually thereafter, and gives the customer a notice that information may be provided to such party and that the customer has the opportunity to prevent the transfer of such information (to "opt out"):

(a) Except as otherwise provided in this subchapter, a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title.

(b) Opt out

(1) In general

A financial institution may not disclose nonpublic personal information to a nonaffiliated third party unless--

(A) such financial institution clearly and conspicuously discloses to the consumer, in writing or in electronic form or other form permitted by the regulations prescribed under

section 6804 of this title, that such information may be disclosed to such third party;

> (B) the consumer is given the opportunity, before the time that such information is initially disclosed, to direct that such information not be disclosed to such third party; and

> (C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

15 U.S.C. § 6802(a) & (b)(1).

There are exceptions to the notice and opt-out requirements as well. For instance, the opt-out notice is not required when an FI provides such information to a third party as part of a "joint marketing program":

> This subsection shall not prevent a financial institution from providing nonpublic personal information to a nonaffiliated third party to perform services for or functions on behalf of the financial institution, *including marketing of . . . financial products or services offered pursuant to joint agreements between two or more financial institutions. . . ..*

*Id.* § 6802(b)(2) (emphasis added).[16]

Ironically, Affinion argues that § 6802(d) does not apply because, as discussed above, it does not seek to obtain bank customers' account numbers for the purpose of marketing, but then argues that banks may provide it with customer information without complying with the notice and opt-out provisions because it is engaged in a joint-marketing program with the banks. While the Court finds, as set forth above, that Affinion is engaged in marketing its *own* products after the termination of a JMA with a bank (and the bank's giving notice of intent not to renew the JMA), it is by definition no longer engaged in the "marketing . . . financial products or services offered pursuant to joint agreements" at the time it seeks to contact customers directly for the purpose of engaging the customers to maintain the products and services they have been receiving through Affinion. Consequently, the "joint-marketing exception" to the notice and opt-out requirements does not apply to this situation. *See also* 12 C.F.R. § 40.13(a)(1)(i) & (ii) (requiring that the joint-marketing contract must expressly prohibit the third party (*i.e.*, Affinion) from using non-public information "other than to carry out the purposes for which the bank disclosed the information," that is, for joint-marketing purposes); *id.* § 40.13(a)(2) (stating that the contract governing the relationship

---

[16] The regulations define a joint-marketing program that falls within this exception as a written contract pursuant to which a bank and one or more financial institutions jointly offer, endorse, or sponsor a financial product or service. 12 C.F.R. 40.13(c). There seems to be no dispute that the JMAs between Affinion and its partner FIs qualify as joint-marketing programs between financial institutions.

meets the regulatory requirements if it prohibits the nonaffiated third party from "disclosing or using the nonpublic personal information except as necessary to carry out the joint marketing"). Because Affinion's contacts with the bank's customers after the bank has given its notice of non-renewal or after the actual expiration of the JMA are not in furtherance of the joint-marketing program, such contacts would not fall under this exception.

However, the statute provides an additional exception for the disclosure of nonpublic personal information "as necessary to effect, administer, or enforce a transaction that the customer requests or authorizes, or in connection with . . . [s]ervicing or processing a financial product or service that a consumer requests or authorizes." 15 U.S.C. § 6802(e)(1)(A); 12 C.F.R. §§ 40.14(a)(1). Affinion asserts that its obtaining account numbers and other personal information from banks after termination or notice of non-renewal falls within this exception, because Affinion seeks merely to continue providing the same services or products that it was providing, at the customers' requests, prior to termination of the JMA between Affinion and the individual bank.

EOC argues that this exception does not apply because the "product" Affinion wants to continue providing (for example, a life insurance policy and identity-theft protection), at least with respect to the "embedded" accounts discussed above, is actually different from the original product requested by the customer, which was enrollment in a checking account program that also included a life insurance policy, identity theft protection, and perhaps other banking-related services such as free checks and overdraft protection. Likewise the fee the customer has been paying since enrolling is a single fee that covers both the maintenance fee on the checking account plus whatever other enhancements the bank offered, as well as whatever services Affinion has been providing. As a result, EOC argues, the post-termination benefits offered by Affinion are necessarily different from the original "product" purchased by the customer—that is, a checking account with a package of associated benefits. Instead, what Affinion offers post-termination is a different package of benefits comprised only of the products Affinion was contributing, and the fee for these products is not necessarily one that the customer has negotiated and agreed to, since he will now be paying at least two fees instead of one, which may or may not total the

single fee he was previously paying in association with his account.[17]  The Court agrees that, as EOC argues, "the fundamental product is completely different."  (EOC Reply Brief, Doc. No. 159, at 4.)

Moreover, even if the Court were to accept Affinion's counter-argument that the unbundled products are still the same products the customer previously requested and authorized, and even assuming that the total price for all the unbundled products is equivalent to the bundled price, the fact remains that the only reason Affinion has need to obtain customer information, and specifically account numbers, is so that it may directly debit customers' accounts in the event they do not opt out of continuing to receive the products from Affinion.  In that regard, the Court finds that the discussion below, regarding Affinion's authority to effect ACH debits on customers' account under Regulation E and the NACHA Operating Rules, necessarily informs the interpretation of the GLBA and its implementing regulations: There is no sense in which it is necessary, required, lawful or appropriate for the FIs to share customer account numbers with Affinion in order to permit Affinion to effect ACH debits that are not properly authorized.  And, as is also discussed below, the banks' customers, at least those bank customers whose accounts Affinion has not been debiting directly all along, appear not to have actually authorized ACH debits by Affinion.  In short, an ACH debit to be effected by Affinion is not a transaction that has been knowingly requested or validly authorized by the consumer.  Moreover, even if 12 C.F.R. § 40.14 could be read to permit the disclosure of customer information and account numbers to permit Affinion to continue to provide insurance-related and other products to the customers, other regulations specifically prohibit Affinion's use of the account information by effecting direct debits on customers' accounts.  The Court turns next to that issue.

### (ii)        Regulation E, 12 C.F.R. § 205.10

When the Electronic Funds Transfer Act was enacted, the Federal Reserve was given the responsibility to develop the implementing regulation.  The resulting regulation, "Regulation E," 12 C.F.R. § 205.10, is intended to protect consumers from unauthorized transfers, and to govern the rights and

---

[17]  Affinion's 30(b)(6) witness, Douglas Smith, agreed that "[w]hen there is a continuation of benefits, the customer is not getting the same package that the customer had received [from] the bank" (Smith Dep. 411:15–19), but also testified that he did not know whether the fee that Affinion debits after termination is the same:

Q.  Now, when the bank terminates its agreement with Affinion and Affinion implements COB, Affinion charges a new amount to that customer, right?

A.  Correct, I assume.  I don't know if, in all cases, it would be a new amount. . . .

(Smith Dep. 413:7–12.)

responsibilities of those entities providing electronic payment services to consumers. The Regulation defines what businesses must do to obtain valid permission from a consumer to initiate a recurring electronic ("ACH") debit against a consumer's account at a bank or a credit union.

Regulation E states in pertinent part:

Preauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer.

12 C.F.R. 205.10(b). The Official Staff Commentary and Interpretation further provide that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. Pt. 205, Supp. I, Official Staff Interpretation of § 205.10(b), at ¶ 6.

EOC argues that the "authorizations" upon which Affinion relies to directly debit customer accounts after a partner FI terminates its contractual relationship with Affinion do not meet the requirements of Regulation E because the language used on the forms upon which Affinion relies does not "authorize" an electronic debit in "clear and readily understandable" language. In that regard, as reflected in the discussion of the facts above, the Court notes that the language used on the enrollment forms varies. That language includes the following, as well as variations on these terms:

Member agrees to the terms of the insurance coverage, other services, any applicable monthly membership dues, and any announced changes in fees or services. . . .

(Doc. No. 53-1, at 8 ("Membership Enrollment").)

Your monthly membership dues, if applicable, will be conveniently deducted from your checking account by either your FI or FSA. . . .

(Doc. No. 53-1, at 9 ("Membership Agreement").)

Member . . . agrees to any applicable monthly membership dues. . . .

(Doc. No. 53-1, at 12 ("Membership Enrollment").)

These particular forms do not reference the word "authorize." While EOC's expert seems to place great emphasis on the need for the word "authorize" or "authorization" actually to appear on the form in order to comply with the rules, the Court agrees with Affinion that the use of that particular word is not necessarily dispositive. In theory, an authorization could be readily identifiable "as such," that is, as an authorization, even in the absence of the word "authorize." Notwithstanding, the forms quoted above are not readily identifiable as authorizations because the language used therein does not clearly and

understandably give Affinion permission to debit funds electronically from the customer's account. A customer's agreement to pay fees or dues is not equivalent to his granting permission to a third party to debit his bank account directly for the amount of those dues.

Further, in most of the enrollment forms that employ wording similar to those referenced above, no third party is referenced at all, and the customer is not informed that some entity other than his own bank might at some future point be deducting funds from the customer's account. In the one sample cited above in which a third party—FSA—is referenced, the form is not worded in such a way as to suggest that the customer is authorizing or permitting or agreeing to an electronic debit. Rather, the form suggests that the customer has no choice in the matter—funds will be conveniently deducted from the customer's checking account—either by his own bank, or by FSA. The customer's only knowledge about FSA seems to be that it is the name of the club in which the customer has just enrolled when he signed up for his enhanced checking account.

Thus, even if that particular form could be construed to authorize an electronic debit through ACH, it suffers from the same problem as those forms that actually use the term "authorize," such as the following:

> By signing, you authorize your FI or its service provider to debit your checking account for your monthly membership dues, if applicable. . . .

(Doc. No. 53-1, at 8; Doc. No. 124-12 ("Membership Agreement").)

> By signing, you authorize your FI and/or the Plan Administrator to debit your checking account at your FI directly or by electronic debit for your monthly membership dues, if applicable.

(Doc. No. 53-1, at 11 ("Membership Enrollment Agreement").)

> By signing, you authorize your FI and/or the plan administrator to debit your checking account at your FI directly or by electronic debit for your monthly membership dues, if applicable. . . .

(Doc. No. 53-1, at 14 ("Membership Enrollment Agreement").)

The problem with these examples is that while the reference to "your FI" is clearly to the customer's own bank, the "service provider" and "Plan Administrator" are never defined or identified as unaffiliated third parties. Similarly, FSA's role in the transaction and its relationship with the bank is never made clear. As indicated above, FSA is vaguely identified as some type of association or club the customer joins when he or she opens an enhanced checking account. In the context of these enrollment

forms, the references to FSA, "service provider," and "plan administrator" are most reasonably understood to pertain to an agent or affiliate of the bank. Thus, while the customer may be aware that he is authorizing the bank or its agent/affiliate to initiate a debit against the account, it is not clear he understands that he is authorizing an unaffiliated third party to do so. In that regard, the Court finds as a matter of law that identification of the party authorized to initiate an ACH debit is an essential "term" of such an authorization, and the failure of an authorization form to identify that party means the authorization does not meet the requirement that it "terms" be "clear and readily understandable."

Affinion argues that the authorization forms are nonetheless valid because they clearly authorize the customer's own bank to debit the account, and, pursuant to a recent amendment to Regulation E, a new authorization is not required "when a successor begins collecting payments." Reg. E., Official Staff Interpretation, § 10(b)-1. The problem with this position is, first, that Regulation E does not apply to debits by a bank from its own customers' account for payment of bank services. Second, Affinion is not a "successor" to the bank in the ordinary sense of that term, because it is not stepping into the bank's shoes as a successor in interest, and the bank's overall relationship with its customer does not change. Affinion remains an unaffiliated third party.

In short, the Court finds that the authorizations in question do not meet the requirements of Regulation E, as construed in the "Official Staff Interpretations."

### (iii)    The NACHA Operating Rules

NACHA is a nonprofit association that facilitates and privately regulates electronic payments through the ACH (Automated Clearing House) network. NACHA, formerly known as the National Automated Clearing House Association, includes nearly 11,000 financial institutions as its members. All parties using the ACH Network, including federal and state governments, must agree to abide by the ACH Operating Rules, which are administered by NACHA. The NACHA Operating Rules are essentially a multilateral contract that binds all ACH participants under a series of warranties, rights, and responsibilities. Thus, all financial institutions are required by contract to conform with the NACHA Operating Rules when performing ACH electronic transactions. The ACH Network is one of the largest electronic payment networks in the United States.

The ACH network differs from other financial networks, including credit card, debit card, and

paper check networks, in that the consumer directly authorizes the Originator (defined as the entity initiating entries into the ACH Network) to send money directly into or take money directly out of his account, without the requirement of a direct relationship between the Originator and the consumer's bank holding the account that is to be debited or credited.  Because the consumer's bank does not receive the consumer's authorization and itself has no direct relationship with the Originator or the Originator's bank, the consumer's bank relies on a series of warranties received from the Originator through its bank that it has received proper authorization from the consumer before initiating a debit.  Based on those warranties, the consumer's bank must process the transaction.

Similar to Regulation E, the NACHA Operating Rules require that an authorization to debit a consumer's account through the ACH Network must be "readily identifiable as an authorization [and] its terms must be clear and readily understandable."  NACHA 2010 Operating Rules § 2.1.2.  The NACHA Rule adds that "the authorization must provide that the Receiver may revoke the authorization only by notifying the Originator in the manner specified in the authorization."  *Id.*  In 2010, the ACH Operating Rules were amended to add this sentence to § 2.1.2:  "Any purported authorization that is not clear and readily understandable to its terms (including the amount and the timing of the debits) or that is otherwise unlawful under applicable law, does not satisfy the requirements of this subsection 2.1.2."

A model "Authorization Form" illustrating what NACHA considers to meet the regulatory and NACHA requirements is attached to the expert report submitted by Elliott McEntee on behalf of EOC.  The form is titled "Authorization Agreement for Direct Payments (ACH Debits)," includes a line for indentifying the "Company" initiating the debits, and states:  "I (we) hereby authorize [the Company] to initiate debit entries to my (our) . . . Checking Account . . . indicated below at the depository financial institution named below, hereafter called DEPOSITORY, and to debit the same to such account. . . ." (*See* Doc. No. 53-1, at 17 (2009 ACH Operating Rules and Guidelines, Sample ACH Debit Authorization Form.)

EOC and its expert argue that the "enrollment agreements" upon which Affinion relies to debit customer accounts directly do not satisfy the NACHA rules just as they do not comply with Regulation E.  The Court agrees, and finds that the authorizations fail to conform to the standards imposed by the NACHA Rules for the same reasons they fail to comport with Regulation E:  The forms are not "readily

identifiable" as authorizations, and their terms, including the identity of the entity to perform the debit, are not "clear and readily understandable."

In addition, the forms do not provide the consumer with clear information about the amount and timing of the ACH debits that Affinion will be effecting. At the time the consumer first opens his "enhanced" account at his bank of choice, his bank begins debiting the maintenance or enrollment fee on a monthly basis. The bank, however, is not subject to the NACHA Rules governing ACH transactions when it is debiting its own customer's account for services it provides to the customer, so the information concerning the amount and timing of the debits would not be initially required. Moreover, even if the amount to be debited were on the original enrollment form, the amount of a debit effected by Affinion is different from the amount of the debit previously performed by the bank.

Third, the forms do not contain information on how the consumer may revoke the authorization. In that regard, some of the forms state that the consumer can cancel her membership "at any time by completing a Waiver of Benefits, which may be obtained from your FI or FSA." These forms refer to the cancellation of the consumer's "membership," in FSA, the imaginary club, but do not expressly reference termination of the ACH debits. Further, at the point at which Affinion (or FSA) is instituting ACH debits directly, the consumer's own bank is not the Originator of the debit and presumably no longer has a relationship with Affinion, so contacting that institution would not be effective for terminating the ACH debit. Nor do the forms contain any information about how to obtain a "Waiver of Benefits" or how to contact FSA directly.

In practice, it appears that Affinion sends a notice to the consumer at the time the consumer's bank ends its relationship with Affinion. The notice explains how the consumer may revoke the "authorization." Affinion contends this "notice" satisfies the NACHA requirements but the Court disagrees. The NACHA Rules clearly contemplate that the notice regarding the ability to revoke the authorization must be part of the authorization itself, which must be signed by the consumer. The notice sent out by Affinion does not satisfy that requirement, because the consumer never signs it to document his receipt thereof.

AS EOC's expert, Elliott McEntee, states in his report, it is apparent that the membership forms relied on by Affinion seek to achieve several incompatible objectives and obtain several permissions in

one form.  That is, by signing one rather vague "enrollment" or "membership" agreement, the consumer opens a checking (or savings) account, enrolls in a membership program, authorizes his bank to debit the account for the monthly account maintenance fee and the program membership fee—which are rolled into one, with no explanation or breakdown of the costs of the individual components of the program— and at the same time, according to Affinion, authorizes Affinion to begin initiating ACH debits on the consumer's account specifically and only for the amount of the fee attributable to the services Affinion is contributing to the membership program which, again, are never identified to the consumer.  And this purported authorization does not take effect until and if the consumer's own bank terminates its relationship with Affinion—which potentially will not occur until years, even decades, into the future, if ever.  The inherently schizophrenic nature of these forms is problematic even without reference to the other problems identified herein.

(iv)      The Effect of Regulation E and the NACHA Rules on the JMAs

The Court has concluded that the "Enrollment Agreements" and "Membership Agreements" upon which Affinion relies as authorizations for it to effect electronic debits do not comply with Regulation E or the NACHA Rules.  Thus, clearly, if Affinion were relying on these forms to bring a breach-of-contract action against the individual bank customers who sign the forms, such a contract claim would fail based on the unenforceability of the purported contracts.  Any claim for inducement to breach the membership forms would therefore also fail.

Here, however, Affinion brings suit against EOC for inducing the breach of the COB provisions in the Joint Marketing Agreements and Fee Income Program Schedules.  Arguably, banks that complying with the terms of the COB provisions after terminating their relationship with Affinion do not directly violate Regulation E or the NACHA Rules; instead, Affinion would violate those rules by effecting ACH debits without valid authorization.  However, in providing customers' nonpublic personal information and account numbers to Affinion, banks violate their customers' privacy in violation of the GLBA.  Further, even if that were not the case, in doing so they knowingly hand over the tools to Affinion that permit Affinion to initiate ACH debits against the bank's consumers in violation of Regulation E and the NACHA Rules.  Thus, regardless of whether the contracts actually require actual illegal conduct on the part of the *banks*, the Court finds that the COB provisions that require banks to release information, including their customers'

names and account numbers, to Affinion in order to permit Affinion to initiate ACH debits on those customers' account without proper authorization that conforms with Regulation E and the NACHA Operating Rules, violate public policy. Under Tennessee law, contracts that violate public policy are unenforceable. *Alcazar v. Hayes*, 982 S.W.2d 845, 851 (Tenn. 1998). Consequently, the COB provisions are unenforceable against the banks as a matter of law. Because the provisions are not enforceable, a claim for inducement of their breach will not lie.

It should be noted, however, that neither EOC's motion nor this holding speaks to that provision of the JMA which states: "if for any reason FSA is prohibited from collecting such fees through the ACH, then FI shall, directly or through designated service providers . . . bill and collect such fees from the Fee Income Members on behalf of FSA and forward such fees to FSA." (2006 Fee Income Program Schedule ¶ 6, Compl. Ex. E, Doc. No. 1-1, at 22.) Nor, as previously mentioned, does this holding address those situations in which Affinion has been directly debiting customers' accounts from the outset of the relationship with the individual customers.

### *(c)    Conclusion:  Inducement to Breach Claim*

Because the Court has concluded that the "same or similar" and COB provisions are unenforceable as a matter of law, the Court will grant summary judgment in favor of EOC as to those claims, without reaching the fact-based issues raised by the parties addressed to Affinion's ability to satisfy the other elements of an inducement claim, and without addressing the question of whether the same provisions are unenforceable under federal antitrust law.

### 2.    The TCPA Claim

In footnote 6 of its memorandum in support of summary judgment, EOC argues that it is entitled to summary judgment in its favor as to this claim because (1) Affinion has not alleged any unfair or deceptive conduct sufficient to support a TCPA claim; (2) the TCPA does not apply to anticompetitive conduct (citing *Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006)); (3) EOC is not a "consumer"; and (4) the claim is barred by the one-year statute of limitations.

As an initial matter, it is clear that Affinion's status as a competitor and a corporation does not deprive it of standing to bring a claim under the TCPA. Tenn. Code Ann. § 47-18-103(7) & -109(a); see *ATS Southeast, Inc. v. Carrier Corp.*, 18 S.W.3d 626, 630 (Tenn. 2000) (noting that the TCPA defines

"person" to include "corporations" and permits "persons" to seek damages, and holding that a corporation has standing to bring a private cause of action for treble damages under the TCPA). In addition, EOC appears to be incorrect in asserting that only a "consumer," including a consumer that is also a corporation, may bring a cause of action under the TCPA. The TCPA expressly defines "[d]isparaging the goods, services or business of another by false or misleading representations of fact" as an "unfair or deceptive" act or practice, and permits any "person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part" to bring suit to recover its damages. Tenn. Code Ann. § 47-18-109(a)(1). *See also ATS Southeast*, 18 S.W.3d at 629 ("As previously implied, it is irrelevant whether a corporation is a 'consumer' under the Act because the right of action is given to 'persons' . . . .").

Second, Affinion does not address EOC's statute-of-limitations argument, but neither party has pointed to facts in the record that establish that Affinion's claims either are or are not barred by the statute of limitations. The Court declines to comb through the record to determine when Affinion's claims might have accrued.

Finally, Affinion disclaims EOC's assertion that its TCPA claim is premised upon EOC's anticompetitive behavior. Affinion asserts instead that the factual basis for its TCPA claim is that EOC has obtained confidential information and copies of Affinion contracts to unfairly compete, has knowingly and untruthfully disparaged Affinion, and has engaged in a purposeful scheme that deceives both financial institutions and account holders. EOC responds that even assuming it obtained confidential information in order to "unfairly compete," only deceptive conduct, not anticompetitive conduct, is addressed by the TCPA. It further argues that Affinion has not presented evidence that the statements allegedly made by EOC were actually false or misleading, including statements about Affinion's allegedly inferior products and poor service. EOC further argues that the non-compete and COB provisions of Affinion's contracts are unenforceable, and that claims which relate to Affinion's contracts, rather than to goods or services, are not covered by the TCPA anyway.

The Court finds that, while the TCPA does not appear to address anticompetitive behavior *per se*, and that statements regarding the unenforceability of Affinion's non-compete and COB provisions that are addressed herein would not violate the TCPA, EOC has not carried its burden of pointing to facts in the

record, in its memorandum or in its Statement of Undisputed Material Facts, that demonstrate that it is entitled to judgment in its favor as a matter of law on this issue. The motion for summary judgment as to Affinion's TCPA claim will therefore be denied.

### 3. Affinion's Affirmative Defenses

In the same footnote in which it addresses Affinion's TCPA claim, EOC also asserts that the Court should grant summary judgment to it on certain affirmative defenses Affinion raised in response to EOC's counterclaims, including laches, waiver, estoppel, unclean hands, and EOC's failure to suffer antitrust injury, on the basis that Affinion has not presented any facts supporting these defenses. In support of its motion, EOC cites the deposition of Affinion's 30(b)(6) witness, who testified that he personally had no knowledge of facts supporting those defenses. (Smith Dep. 784:8–786:1.)

The Court finds that Affinion's corporate representative was not required to know and understand the legal definition or elements of those defenses, so his disclaimer of knowledge about them is hardly dispositive. Further, while Affinion did not address these arguments in its response in opposition to EOC's motion, and it is unlikely that Affinion actually intends to pursue these defenses at trial, the Court nonetheless finds that EOC's arguments addressed to these defenses are not properly raised and supported. The Court therefore declines to address them.

### C. CONCLUSION: EOC'S MOTION FOR SUMMARY JUDGMENT

For the reasons set forth herein, EOC's motion for summary judgment will be granted in part and denied in part. Specifically, EOC is entitled to summary judgment in its favor on Affinion's claims of inducement of breach of contract on the basis that the same-or-similar and COB clauses in Affinion's contracts with its bank customers are unenforceable as a matter of law and public policy. In all other respects, EOC's motion will be denied.

## III. AFFINION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In response to Affinion's lawsuit, EOC filed its own counterclaim in which it asserts that Affinion's contracts typically include "no less than five anticompetitive restrictions," including, in addition to the COB and same-or-similar provisions addressed in the context of EOC's motion, above, (1) "[m]ultiyear exclusive dealing agreements that restrict Affinion client banks and credit unions from contracting with Affinion's competitors for value-added checking programs during the term of an Affinion contract," and (2)

a "Right of First Refusal" clause that requires banks or credit unions to disclose the provision of services offered by a third party, under the terms and conditions proposed by such third party, so that Affinion can match or undercut the third party's proposal." (EOC Counterclaim, Doc. No. 62, ¶ 19.) EOC also complains that Affinion routinely uses "confidentiality clauses in its contracts . . . that attempt to force banks not to reveal routine non-confidential information, such as the 'out date' of a contract, which is the date that the term of the Affinion contract expires." (Counterclaim ¶ 20.) EOC claims that all of these clauses in Affinion's contracts prevent EOC and other competitors from competing with Affinion "for the business of Affinion client banks and credit unions that together account for more than 80% of the market for value added checking services." (Counterclaim ¶ 30.) EOC asserts that, as a result of Affinion's allegedly anticompetitive contracts which require exclusive dealing, Affinion has been able to charge "significantly higher prices and offer lower-quality services" than its competitors, including EOC, and that EOC has thereby been damaged in an amount to be proven at trial. (Counterclaim Count I.)

EOC also alleges that Affinion possesses market power in the market for value-added checking account services, and that by using the anticompetitive clauses in its contracts it has been able to lock in its client banks and exclude competitors by foreclosing over 80% of the market, which has in turn allowed Affinion to charge "supra-competitive prices" for lower-quality and fewer services. EOC claims that Affinion's contracts are unreasonable restraints of trade by which EOC has been damaged in an amount to be proven at trial. (Counterclaim Count II.) EOC also alleges that Affinion has monopoly power and that the same contract provisions have allowed Affinion to "substantially exclude its competitors from the market for value-added checking account services." (Counterclaim ¶ 59, Count III.) In the alternative, EOC alleges that Affinion has attempted to exercise monopoly power and that there is a dangerous probability that it will achieve monopoly power. (Counterclaim Count IV.)

In Count V of the counterclaim, EOC alleges that it had existing and prospective business relationships with certain banks, that Affinion had knowledge thereof, and that Affinion intended to and did cause these banks not to contract with EOC, thereby intentionally interfering with existing and prospective business relationships and causing financial damage to EOC.

Finally, EOC seeks a declaratory judgment that "Affinion's restrictive contractual provisions, including its exclusive dealing, 'same or similar' and continuation of benefits clauses" are unenforceable

(Counterclaim ¶ 82), and an injunction "prohibiting Affinion from attempting to enforce its illegal contractual provisions in existing contracts or using such contractual provisions in future contracts." (Counterclaim ¶ 88.)

In its own motion for summary judgment, Affinion seeks summary judgment in its favor on all of EOC's counterclaims. That motion will be denied in its entirety for the reasons explained below.

First, the Court will deny Affinion's motion for summary judgment on EOC's Tenth Affirmative Defense and as to EOC's claims for a declaratory judgment directed to the same-or-similar and COB clauses, because the Court has already found in connection with EOC's motion that those specific provisions are unenforceable. The Court notes that neither party's motion for summary judgment expressly addresses the enforceability of the exclusive-dealing or right-of-first-refusal clauses.

With respect to EOC's antitrust counterclaims, the Court already denied from the bench the motion to exclude testimony from EOC's expert, Adam Rennhoff, Ph.D., and the Court declines to revisit that ruling here. As a result, it appears that there are material issues of disputed fact as to the definition of the "relevant market" at both the product level and the geographic level, whether Affinion enjoys substantial market power, whether Affinion's contracts have anti-competitive effects, and whether EOC has suffered antitrust injury, among possible others. The motion for summary judgment as to EOC's antitrust counterclaims will therefore be denied.[18]

With respect to EOC's claim for intentional interference with existing and prospective business relationships, Affinion asserts that this claim is premised entirely on the same facts as the antitrust claims. The record reflects, however, that EOC's intentional-interference claim is independent of and based on different factual allegations than the antitrust claims. Affinion does not specifically address the independent factual basis for the intentional-interference claim in its motion for summary judgment, so the motion for judgment as to that claim will also be denied on the basis of disputed issues of material fact.

Finally, with respect to EOC's request for a permanent injunction, the only basis for Affinion's motion for summary judgment of that claim is that its non-compete and COB clauses are enforceable and are not anticompetitive. The Court has concluded that they are not enforceable. Although EOC certainly has not at this point in the game proven that it is entitled to an injunction, Affinion likewise has not

---

[18] It remains unclear to the Court to what extent the antitrust claims may be mooted by the Court's determination that the one-year non-compete and COB clauses in Affinion's contracts are unenforceable.

conclusively established that it is not. Summary judgment on that claim is therefore not warranted either.

## IV. CONCLUSION

An appropriate Order will be entered denying in part and granting in part EOC's motion for summary judgment, and denying Affinion's motion for summary judgment.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge